## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CAPITAL BUILDERS, INC. as the General            )
Partner of E&R PARTNERS, L.P., et al.,           )
                                                 )
            Plaintiffs,                          )
                                                 )        Civil Action No. 2:21-cv-1069
        vs.                                      )        Magistrate Judge Patricia L. Dodge
                                                 )
TOWNSHIP OF ROBINSON, et al.,                    )
                                                 )
            Defendants.                          )

## **MEMORANDUM OPINION**[1]

Plaintiffs James Esposito and Capital Builders, Inc. as the General Partner of E&R Partners, L.P. (collectively referred to as "Plaintiffs") bring this civil rights action against Defendants Township of Robinson (the "Township"); Richard Urbano, the Township's Planning Director, Zoning Officer, and Chair of the Planning Board; Joseph Schonbeck, the Township's Code Enforcement Officer; and Michael Dunn, the principal and managing member of Five-D Development, LLC (sometimes collectively referred to as "Defendants"). Plaintiffs' claims arise out of actions taken by Defendants with regard to property owned by E&R Partners, L.P. located within the Township. Specifically, Plaintiffs allege that Defendants conspired to carry out an unlawful scheme designed to interfere with Plaintiffs' constitutionally protected property rights, including initiating and prosecuting an allegedly improper condemnation action against Plaintiffs' property.

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. Therefore, the undersigned has the authority to decide dispositive motions and enter final judgment.

Presently pending before the Court are two motions for summary judgment (ECF Nos. 38, 60), and a motion for partial summary judgment (ECF No. 47).

## I.     Relevant Procedural Background

Plaintiffs originally commenced this action in state court, and Defendants subsequently removed to federal court in August 2021.  (ECF No. 1.)  Federal question jurisdiction stems from the civil rights claims, 28 U.S.C. § 1331, and supplemental jurisdiction is asserted over the state-law claims, 28 U.S.C. § 1367(a).

The Complaint contains five counts: 1) malicious prosecution brought by James Esposito against Defendants Urbano and Schonbeck; 2) tortious interference with contractual relations brought by Capital Builders, Inc. and E&R Partners, L.P. against Defendants Urbano and Schonbeck; 3) civil conspiracy brought by Plaintiffs against Defendants Urbano, Schonbeck, and Dunn; 4) violation of 42 U.S.C. § 1983 brought by Capital Builders, Inc. and E&R Partners, L.P. against Defendants Urbano, Dunn, and the Township; and 5) violation of 42 U.S.C. § 1983 brought by James Esposito against Defendants Urbano, Schonbeck, and the Township.[2]

Defendant Dunn moved for summary judgment on August 17, 2023, (ECF No. 38), the Township and Defendant Urbano moved for partial summary judgment on August 25, 2023, (ECF No. 47), and Defendant Schonbeck moved for summary judgment on October 25, 2023, (ECF No. 60).  All three of the motions have now been fully briefed, (ECF Nos. 39, 40, 41, 48, 49, 50, 57, 58, 59, 61, 62, 63, 64, 70, 71, 72, 73, 74, 77, 78, 79, 80, 81, 82, 88), and are ripe for review.

---

[2]  This claim is erroneously labeled as a duplicate "Count IV" in the Complaint.  (ECF No. 1-3 ¶¶ 132-146.)

II.     **Relevant Factual Background**[3]

This case centers around the condemnation of a 188.05 square foot portion of the larger parcel of real property located at 5852 Steubenville Pike in Robinson Township, Pennsylvania (the "E&R Property"). E&R Partners, L.P. ("E&R Partners") purchased the property in 2001. (ECF No. 64 ¶¶ 1-2.) Since 2003, the E&R Property has had direct access to Steubenville Pike ("Route 60") via a private driveway leading to a traffic signal at the intersection of Route 60 and Tidball Road (the "Tidball traffic signal"). (*Id.* ¶ 12.) Capital Builders, Inc. ("Capital Builders") is the General Partner of E&R Partners. (*Id.* ¶ 3.) James Esposito ("Esposito") is the principal and president of both Capital Builders and E&R Partners and was responsible for the day-to-day operations and use of the E&R Property. (*Id.* ¶ 4.)

Michael Dunn ("Dunn") operates M.A. Dunn Construction Company, which specializes in commercial development and renovation, and is the principal and managing member of Five-D Development, LLC ("Five-D"). (*Id.* ¶ 11.) Dunn has also served as a member of the Township's Zoning Hearing Board since approximately 2017. (*Id.* ¶ 9.)

In 2011, Five-D purchased the parcel of land located at 5890 Steubenville Pike (the "Five-D Property"), immediately adjacent to, and to the west of, the E&R Property. (*Id.* ¶ 13-14.) The purchase was made with the specific intent that Dunn would eventually develop a strip mall called "Pike Plaza" on the property. (*Id.* ¶ 16.) However, unlike the E&R Property, the Five-D Property

---

[3] The history of this case is extensive and has given rise to multiple litigations in the state courts. The facts in the subsequent sections of this Opinion are drawn from the competing concise statements of material facts and responses thereto. (ECF Nos. 40, 49, 58, 61, 64, 71, 72, 78, 81.) As outlined below, the parties disagree on a significant number of facts that are relevant to the disposition of Defendants' motions for summary judgment. These disputes are noted throughout.

did not enjoy direct access to Route 60. (*Id.* ¶ 15.) Prior to making the purchase, Dunn spoke to Richard "Rick" Urbano ("Urbano"), the Township's Planning Director, Zoning Officer, and Chairman of the Planning Board, regarding whether the property had access to Route 60 via the Tidball traffic signal. (*Id.* ¶ 23.) Urbano assured Dunn that the Tidball traffic signal had been installed in anticipation of future development of the Five-D Property, and that the Township intended it to eventually become a four-way intersection.[4] (*Id.* ¶ 24.) (ECF No. 72 ¶ 48.)

In early 2015, Dunn began approaching Esposito regarding the possibility of a proposed "shared driveway" that would provide both the E&R and Five-D Properties signalized access to Route 60. (1/16/15 M. Dunn email to J. Esposito, ECF No. 65-4.) Dunn's proposal called for closing the private E&R Property driveway, installing a new shared driveway primarily on the Five-D Property, and moving the existing Tidball traffic signal from the E&R Property onto the Five-D Property. (ECF No. 71 ¶¶ 116, 120.) (12/28/21 Esposito Dep. at 63-64, ECF No. 59-32.) Esposito rejected the proposal because he felt that it provided no benefit to his property and instead would have resulted in the loss of parking spaces at the front and side of the E&R building. (ECF No. 71 ¶ 118.) Additionally, the shared driveway would require that visitors traverse the Five-D Property in order to access the E&R Property.[5] (*Id.* ¶ 117.) Dunn's proposal did not include any form of compensation for Esposito's cooperation. (*Id.* ¶ 130.)

---

[4] Plaintiffs adamantly dispute the Township's assertion that the plans to convert the existing Route 60/Tidball intersection into a four-way intersection predated Dunn's purchase of the Five-D Property and subsequent submission of the Pike Plaza development plans. (ECF No. 58 ¶¶ 14-15.)

[5] Dunn disputes that the shared driveway would not have provided a benefit to Plaintiffs, arguing that "Plaintiffs and visitors to the E&R Property would have benefitted from the safety improvements to Route 60, the intersection, and the new roadway." (ECF 71 ¶ 117.) Additionally, the Township Solicitor testified that "Esposito was told that if the parties could agree to a new public road, 'we'll pave your [Esposito's] parking lot,' and '[w]e'll do whatever is necessary back there to make this a better situation for you [Esposito].'" (*Id.*) (alteration in original).

4

On April 23, 2015, Dunn met with PennDOT representatives. (*Id.* ¶ 127.) The following day, Dunn sent Esposito a letter purportedly giving Esposito a "final opportunity" to sign an agreement for a shared driveway on the Five-D Property that would constitute the "new entrance" to the E&R Property. Dunn included drawings of the proposed shared driveway prepared by NIRA Engineers and gave Esposito until May 1, 2015, to respond. Otherwise, Dunn said that he would submit plans for a single use driveway on the Five-D Property to PennDOT and the Township. (*See* 4/24/15 M. Dunn letter to J. Esposito, ECF No. 65-6.) Esposito did not respond.

Following Esposito's rejection, Dunn began contacting various representatives from the Township and PennDOT. At a meeting on August 5, 2015, the Township conditionally approved a site plan prepared by NIRA Engineers with the option of a shared driveway, subject to PennDOT approval. (ECF No. 71 ¶¶ 134-136.) Because Route 60 is a state road, any direct access to Route 60 required that PennDOT issue a Highway Occupancy Permit ("HOP").

On October 15, 2015, Dunn emailed PennDOT representative Dan Cessna ("Cessna") requesting a follow up meeting. Dunn stated that he had been trying to work things out with Esposito "for close to a year with no response[,]" and alleged that the E&R Property had been using the Tidball traffic signal without proper HOP permitting. (10/15/15 PennDOT email chain, ECF No. 65-7.) Cessna forwarded Dunn's email to several other PennDOT employees, including Todd Kravits ("Kravits"), who replied:

> He's not giving you the full story. By virtue of a traffic signal permit issued to [the Township] many years ago, Mr. Esposito's driveway is signalized. We cannot take the signal away and give it to Mr. Dunn.
>
> Unfortunately for Mr. Dunn. He would like his driveway to be signalized as well. For that to occur, he and Mr. Esposito have to come to an agreement

on a joint use driveway since the Dunn driveway impacts the Esposito drive and visa [sic] versa. Without that agreement, Mr. Dunn will have to access his site from the side road to the south of Tidball.[6]

The problem is that these two gentleman have an adversarial relationship at best and Robinson Twp is not doing anything to assist in working this out.

We have repeatedly asked that both parties and the Township work this out, but none are willing to step up to do so.

It's quite the mess.

(*Id.*)

On November 25, 2015, PennDOT sent a letter to Dunn informing him that "if he would like [his] site driveway to have access to the [Tidball] traffic signal, then we recommend that you and Mr. Esposito work together to develop a mutually agreeable solution that is acceptable to both the Township and [PennDOT]." (11/25/15 PennDOT letter to M. Dunn, ECF No. 65-9.)  The letter also referenced the August 5, 2015, meeting, during which PennDOT staff had informed Dunn that only the E&R Property, and not the Five-D Property, was approved for signalized access to Route 60.  (*Id.*)   In additional correspondence, PennDOT's Assistant District Traffic Engineer informed an engineer working for Dunn: "Whatever actions you want to take pertaining to the driveway and the signal are between you, the Township and the two property owners. If you come to a resolution, we will review the revised signal plans and HOP's. Until then, we are not to be involved." (1/13/16 PennDOT email to C. Wooster, ECF No. 65-10.)

---

[6]  Although not accessible from Route 60, the Five-D Property is accessible from Waterford Drive, a public roadway that intersects Route 60 approximately five hundred feet to the south of Tidball Road.  (*See* ECF No. 64 ¶ 15.)

On December 7, 2015, the Township Manager sent a letter informing Esposito that the Township Board of Commissioners approved the "Motion to approve the Site Plan for [the Five-D Property] conditioned upon recommendations of the [Township] engineer's letter dated November 18, 2015 and the Developers Agreement to be drafted by the Solicitor as recommended by the Planning Commission." (12/7/2015 J. Silka letter to J. Esposito, ECF No. 41-3.)  Because access to and from the proposed development continued to be an issue, the Township had begun exploring alternative avenues.  (ECF No. 58 ¶ 10.)  Ultimately, it was decided that instead of installing a shared driveway at the Tidball intersection, Dunn would construct a new public roadway behind Pike Plaza.  (*Id.* ¶ 11.)  The proposed roadway would be built on an existing fifty-five-foot easement held by the Township across the northern end of the Five-D Property and would connect Route 60 to Waterford Drive, a nearby public roadway.[7]  (*Id.* ¶ 14.)

On April 27, 2016, Dunn's engineer resubmitted development plans for the Five-D Property that included the addition of the new public roadway.  PennDOT replied that Esposito must "agree to this concept before [the] Department will approve" and reiterated that Esposito would need "to sign the plan stating his concurrence with improvements on [the] plan." (4/27/2016 PennDOT email to R. Caruso, ECF No. 65-11.)  Additionally, the "Township will have to show how they paid Mr. Esposito for his Right of Way that they obtained. When the Township holds the Right of Way, we can approve the HOP." (*Id.*)

---

[7] The Township Solicitor testified that the easement was reserved after a residential plan was built on Waterford Drive with the intent that the easement would eventually provide signalized access from Route 60 to the Waterford plan. (12/12/2022 J. Cambest Dep. 34, ECF No. 40-2.)  Plaintiffs adamantly dispute that the plans for a proposed road predate Dunn's submission of the Five-D Property development plans.

On July 26, 2016, Township Solicitor John Cambest ("Solicitor Cambest") sent Esposito a letter advising that the Township received Dunn's application for the Five-D Property development.  (7/26/2016 J. Cambest letter to J. Esposito, ECF No. 65-12.)  The letter stated:

> After reviewing the Application, the Township believes that, after consultation with the Department of Transportation, in order to assure the safety of vehicles traveling on [Route 60] and Tidball Road that a relocation of the existing traffic signal to line up with the proposed entrance to the Dunn Development is in the best interest of all parties concerned. For your convenience, I am enclosing a copy of a proposed relocation of the existing traffic lights. In order to complete the relocation of the traffic signal, it will be necessary to remove the existing bituminous driveway that enters and/or exits onto [Route 60] and is immediately adjacent to the Dunn property. In addition, the existing bituminous driveway on the other end of your property will be changed to a right turn in/out.
>
> Both the Township and the Department of Transportation would appreciate your reviewing the enclosed proposed Plan and contacting me with any questions or comments you might have. As I indicated earlier in this letter, it is the belief of the Township that the enclosed Plan is the best way to insure [sic] the safety of all vehicles traveling on [Route 60], Tidball Road and entering and exiting onto [Route 60] from our property and from the proposed Dunn Development.

(*Id.*)

On February 6, 2017, PennDOT representatives advised Dunn on "the current Department policy and procedure for executing indemnification."  (2/6/2017 PennDOT email chain, ECF No. 65-14.)[8]  PennDOT's Acting District Highway Occupancy Permit Manager told Dunn that, in addition to numerous forms and documentation, Dunn would also need to compile "a number of certified letters, previous meetings, concessions made to appease Mr. Esposito, etc.[,]" along with

---

[8]  Dunn forwarded these emails to Urbano's secretary, stating: "Rick[,] Please see the comment from Penn. Dot . [sic]" (ECF No. 65-14.)

"a formal offer of compensation" for Esposito before the state could proceed with any further review of Dunn's traffic signalization application. (*Id.*) Still, Dunn failed to make Esposito any offer of compensation for the use of the E&R Property. (ECF No. 71 ¶ 130.)

Despite PennDOT's previous acknowledgments that the E&R Property, but not the Five-D Property, held the right to access Route 60 via the Tidball traffic signal, Solicitor Cambest sent Esposito another letter on March 9, 2017, stating:

> Over the past few months the Township has attempted to work cooperatively with you and your partnership to provide a new entrance for the [E&R Property] and to provide you signalization to the intersection of Tidball Road and S.R. 0060 (Steubenville Pike). To accomplish this it would be necessary to close the existing private driveway that provides ingress and egress to [the E&R Property].
>
> For your convenience, I am enclosing a revised Plan which identifies the closure of the private driveway of [the E&R Property]; provides for a new public roadway adjacent to the [E&R Property] as well as a twenty-four (24') foot access roadway that would provide the new access to [the E&R Property]. I am also enclosing for your review the proposed Traffic Signalization Plan, for Tidball Road and S.R. 0060.
>
> The Commonwealth of Pennsylvania has requested that the Township, as the Applicant for this Project, provide you with a copy of the above Plans and to request that you consider cooperating with the Township for the implementation of the new Traffic and Signalization Plan. For your convenience I am enclosing a form for your review that would indicate your voluntary agreement to allow the Township of Robinson to move forward with the proposed changes to Steubenville Pike and the Traffic Signalization to Tidball Road. If you refuse to voluntary [sic] agree to the Application of the Township, the Township will have no other recourse but to move forward with the Commonwealth of Pennsylvania, Department of Transportation to take all necessary action to achieve the changes as outlined on the enclosed Plans.

(3/9/2017 J. Cambest letter to J. Esposito, ECF No. 65-15.)

9

On July 1, 2017, TCI of Pittsburgh ("TCI") became a tenant of the E&R Property and started operating its business out of the premises.  (ECF No. 71 ¶ 149.)  It is disputed whether the E&R Property had tenants in the years leading up to TCI moving in.[9]  (*Id.* ¶¶ 95, 153.)  It is also highly disputed whether E&R Partners held the proper occupancy permit to allow TCI to legally operate out of the E&R Property.  (*Id.* ¶¶ 74-77.)  E&R Partners had obtained a valid occupancy permit from the Township on March 25, 2002, that listed "Capital Realty & Funding Corporation" on the business name line.  (3/25/2002 Certificate of Occupancy, ECF No. 65-2.)  According to Esposito, TCI applied and paid for an additional occupancy permit prior to beginning operations at the E&R Property.  (12/28/2021 J. Esposito Dep. at 88, ECF No. 59-32.)  It is unclear whether TCI's application was ever actually submitted or reviewed by the Township or whether the issuance of a new occupancy permit was even required at all.[10]

In the spring of 2017, the Township began investigating allegations that E&R Partners did not have an occupancy permit, that it was moving tenants onto the property illegally, and that it did not have valid building permits.  Under the Township's Zoning Ordinances, Urbano, as Zoning Officer, was responsible for issuing and maintaining files on all previously issued zoning, occupancy, and building permits.  (*See* § 300-14 Duties of Zoning Officer, ECF No. 79-8.)  Esposito contacted Urbano, who informed him that Dunn had reported someone illegally occupying the E&R Property.  (ECF No. 71 ¶¶ 154-155.)  Dunn later testified that he made the

---

[9]  Dunn testified at deposition that he was under the impression that the building situated on the E&R Property had been vacant for approximately six to eight years prior to TCI moving in.  (3/16/2023 M. Dunn Dep. at 56-57, ECF No. 59-30.)  According to Esposito, however, a previous tenant occupied the space as recently as six to eight months before TCI moved in.  (12/28/2021 J. Esposito Dep. at 87-88, ECF No. 59-32.)
[10]  Defendants collectively dispute that TCI had or applied for a valid occupancy permit.  (*See* ECF Nos. 72 ¶ 93; 81 ¶ 76.)

report because he believed that the E&R Property was condemned or vacant and was not permitted to be used,[11] but that he had seen "a lot of occupants there in the evening, a lot of cars, campfires out back and I just thought it was odd." (3/16/2023 M. Dunn Dep. at 54, ECF No. 59-30.)

Since 2014 and at all times relevant to this action, Joseph Schonbeck ("Schonbeck") served as the Township's sole Code Enforcement Officer. (ECF No. 81 ¶¶ 30, 32.) As Code Enforcement Officer, Schonbeck was tasked with "enforc[ing] the ordinances of the Township." (12/27/2021 J. Schonbeck Dep. 20, ECF No. 79-3.) He had no prior experience with municipal code enforcement, and he did not recall receiving any training upon being hired by the Township. (*Id.* at 33, 38-39.) He also testified that he was unaware of any established policies and procedures with respect to the Township's code enforcement process. (*Id.* at 33, 36.) According to Schonbeck, the Code Enforcement Officer reports directly to the Township's Planning Director, making Urbano Schonbeck's direct supervisor.[12] (*Id.* at 16-18.)

On November 1, 2017, Schonbeck posted a cease-and-desist letter dated October 31, 2017 on the doors of the building located on the E&R Property. (*Id.* at 86-87.) Schonbeck testified that Urbano had instructed him to post the letter.[13] (*Id.* at 90.) The letter was addressed to Esposito and was signed by Solicitor Cambest. (*See* 10/31/2017 Cease & Desist letter, ECF No. 65-17.) It stated, in relevant part:

---

[11] Dunn also testified that he could not recall where he heard this information and that he did not have any additional information to support his conclusion that the occupancy was illegal. (3/16/2021 M. Dunn Dep. 55-56, ECF No. 59-30.)

[12] Urbano disputes that he was Schonbeck's superior, testifying that Schonbeck "reports to me on what goes on, but I don't have any authority to tell him what to do or fire him or hire him or replace him." (12/28/2021 R. Urbano Dep. 39-40, ECF No. 79-6.)

[13] The letter was also sent to Esposito via certified mail. (*See* 11/2/2017 R. Junker letter to J. Cambest, ECF No. 65-18.)

[W]e have received information that an illegal operation may be occurring at the [E&R Property]. It is our understanding that TCI of Pittsburgh is operating a counseling initiative out of the basement of the [E&R Property]. The Township officials have informed us that there is not an Occupancy Permit for the property and for the operation of a business out of that location. This is a violation of the Ordinances of the Township of Robinson.

Accordingly, please accept this letter as the Township's demand that you cease and desist the operation of TCI of Pittsburgh or any other residential or commercial enterprise without obtaining an Occupancy Permit from the Township of Robinson. If you do not cease this operation within forty-eight (48) hours of the receipt of this notification, the Township will have no other recourse than to enforce the laws of the Township of Robinson which will include, but not be limited to, the shutting down of this operation. The Township of Robinson thanks you for your cooperation in this matter. If you have any questions please do not hesitate to contact me.

(*Id.*)

On November 2, 2017, Esposito's attorney sent a letter to the Township in response to the

October 31, 2017, cease-and-desist letter, stating:

In addition to the general allegations and harsh demands in your correspondence, representatives of the Township visited the [E&R] Property today and verbally threatened to padlock the principal structure located on the [E&R] Property if there are signs of occupancy tomorrow, November 3, 2017. Township representatives also verbally alleged additional Township vague and unspecified ordinance violations that must be remedied.

Pennsylvania law and the Township's ordinances set forth comprehensive enforcement procedures that the Township must follow upon discovery of an ordinance violation. No such procedure has been followed at this time. Therefore, any attempt by the Township to shut down E&R Partners' operations or padlock its structure without service of a formal Notice of Violation is improper, contrary to applicable law and Township ordinances, and a violation of my client's due process rights. Moreover, due to the nature of the professional services provided on the [E&R] Property to disabled individuals, execution of such abrupt action by the Township will give raise [sic] to a claim under the Americans with Disabilities Act.

12

(11/2/2017 R. Junker letter to J. Cambest, ECF No. 65-18.)

On November 7, 2017, Schonbeck issued Esposito a non-traffic citation for operating the E&R Property without a valid occupancy permit. (12/27/2021 J. Schonbeck Dep. 40-41, ECF No. 79-3.) Although Urbano had allegedly instructed Schonbeck to begin investigating code violations at the E&R Property, Schonbeck issued the citation based solely on the information obtained from Urbano. (*Id.* at 42-43.) Despite Esposito never being the record owner of the E&R Property, the citation was issued to "James M. Esposito (E&R Partners LP)." (*Id.* at 40-41.) At Urbano's alleged direction, the citation was amended on November 8, 2017, to include an additional violation. (ECF No. 81 ¶ 47.) The initiation of criminal proceedings by the issuance of the non-traffic criminal citation against Esposito was later deemed deficient in multiple respects, primarily due to its failure to comply with mandatory notice requirements set forth under the Municipalities Planning Code. *See Twp. of Robinson v. Esposito*, 210 A.3d 1146 (Pa. Commw. Ct. 2019).

On October 10, 2018, Schonbeck issued a second non-traffic citation to Esposito, in his individual capacity, for "ongoing violations" at the E&R Property. (ECF No. 81 ¶ 83.) The citation was subsequently dismissed by the local magistrate. (12/27/2021 J. Schonbeck Dep. 144-45, ECF No. 79-3.)

Dunn eventually retained David E. Wooster and Associates, Inc. ("Wooster") as the engineer for his company's development of the Five-D Property. (ECF No. 64 ¶ 43.) On April 19, 2018, Jerrod Crosby ("Crosby"), a Wooster engineer, emailed Dunn indicating that PennDOT was "willing to allow for an indemnification to close the Esposito access and modify the signal." (4/19/2018 J. Crosby email to M. Dunn, ECF No. 41-1 at 63-64.) This option would have required

a "Loss Assessment" consisting of "an appraisal of the [E&R Property] as it is today compared to how it would be once the new road and driveway connection are complete. A monetary offer of the difference would be required to be offered to the [sic] Mr. Esposito." (*Id.*)  Crosby then presented Dunn with a second option: the Township could "condemn property along [Route 60] from the Esposito property to allow the traffic signal and roadway to be configured in a more standard design…to provide the most geometrically sound and safe intersection at [Route 60]/Tidball/Proposed local road." (*Id.*)  Dunn forwarded the email to the Township Commissioner, the Township Manager, the Zoning and Planning Secretary, Solicitor Cambest, and Urbano, stating, "Option 2 seems to be the quicks [sic] and less costly." (*Id.*)

On April 24, 2018, Crosby emailed the Township Manager directly with additional Township representatives, including Solicitor Cambest and Township Zoning and Planning Secretary, as well as Dunn cc'd.[14]  Crosby's email stated that, based on his discussions with both PennDOT and representatives of Esposito, "we currently would be required to avoid the Esposito property altogether." (4/24/2018 J. Crosby email chain, ECF 41-1 at 61-62.)  As a solution, Crosby "explained that the next option would be for the Township to condemn the property necessary to provide an intersection that falls within current design standards. PennDOT stated that condemnation would be an acceptable and more desirable way forward to provide the best possible intersection." (*Id.*)  Solicitor Cambest emailed Dunn the next morning, advising that he would discuss condemnation of the E&R Property with the Township Board of Commissioners later that

---

[14]  Later that day, Dunn forwarded the email to Urbano.  (4/24/2018 J. Crosby email to F. Piccolino at 61-62, ECF No. 41-1.)

evening.  (*Id.*)  Shortly thereafter, Solicitor Cambest drafted a resolution to condemn 188.05 square feet of the E&R Property.  (ECF No. 64 ¶¶ 49-50.)  The Board of Commissioners passed the condemnation resolution at its May 7, 2018, meeting.  (*Id.* ¶ 51.)

On May 11, 2018, the Township filed a Declaration of Taking in the Court of Common Pleas of Allegheny County at Docket No. GD-18-006038 (the "Eminent Domain case").  (Decl. of Taking, ECF No. 41-7.)  The Declaration states that the purpose of the condemnation is to "acquire the fee simple title to certain property now or formerly owned by [E&R Partners] for the purpose of constructing a new public road and traffic signalization at the new intersection of Tidball Road and State Route 60[.]"  (*Id.*)

On June 12, 2018, E&R Partners filed Preliminary Objections to the Declaration, arguing that the actual purpose of the condemnation was to take a portion of the E&R Property for the nonpublic, private purpose of benefitting Five-D under the guise of public convenience and safety. (Prelim. Obj., ECF No. 41-8.)  After extensive discovery, the parties filed Stipulated Findings of Fact.  (Stipulated Findings, ECF No. 41-9.)  After briefing and argument, the Court of Common Pleas issued a Memorandum and Order of Court on March 3, 2022, overruling E&R Partners' Preliminary Objections.  (Mem. Order on Prelim. Obj., ECF No. 41-10.)

E&R Partners appealed the Court of Common Pleas decision, and a panel of the Commonwealth Court of Pennsylvania reversed.  *In re Condemnation of the Twp. of Robinson* (*In re Robinson*), No. 312 C.D. 2022, 2023 WL 3047814 (Pa. Commw. Ct. Apr. 24, 2023).  The Commonwealth Court began by reviewing the trial court's findings regarding the five Township Commissioners responsible for passing the resolution to determine "whether Township, as the

Case 2:21-cv-01069-PLD   Document 89   Filed 03/26/24   Page 16 of 39

condemnor, complied with the law regarding its condemnation of E&R Property[.]" *Id.* at *6. The

Commonwealth Court conducted a thorough review of the record before ultimately concluding:

> [T]he record evidence does not support the trial court's conclusion that
> Township's condemnation of E&R Property was for a public purpose.
> Rather, the evidence demonstrates that Township's condemnation of E&R
> Property was on behalf of and for the benefit of Five D. The condemnation
> process was initiated by Crosby, the engineer working on behalf of Five D.
> It was Crosby's e-mail referencing PennDOT's alleged recommendation to
> condemn the property that was relied on by Township Commissioners in
> making the decision for Township to condemn E&R Property. Even
> Township's Commissioners assert that the condemnation was for Five D.
> Specifically, when asked why Township condemned the E&R Property,
> Commissioner Barefoot indicated "my understanding for an entrance to…
> I understand a strip mall there." When asked whether the condemnation was
> done for the development of Five D Property, Commissioner Barefoot
> indicated, "Yes."
>
> ….
>
> The record demonstrates that the public is not the "primary and paramount"
> beneficiary of the condemnation, as is required to conclude that Township's
> condemnation of the E&R Property was for a public purpose.

*Id.* at *13. Accordingly, the Commonwealth Court reversed the trial court's decision.[15] The

Pennsylvania Supreme Court denied the Township's Petition for Allowance of Appeal, No. 190

WAL 2023, on March 6, 2024, thus concluding the condemnation proceedings in the state court.

## III.    Legal Standard

The Federal Rules of Civil Procedure provide that "[t]he court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment

---

[15] The Commonwealth Court denied the Township's application for reargument on June 20, 2023.

may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's favor. *Hugh v. Butler Cty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cty. of Ctr., Pa.*, 242 F.3d 437, 446 (3d Cir. 2001)

## IV.     Discussion

### A.  Dunn's Motion for Summary Judgment

Dunn seeks judgment in his favor with respect to both claims against him, civil conspiracy in Count III and the Fifth Amendment claim in Count IV.

#### 1.  Dunn is not entitled to *Noerr-Pennington* immunity.

Dunn first argues that Plaintiffs' claims against him are barred by the *Noerr-Pennington* doctrine, contending that his "petitions" to the Township for direct access to Route 60 from the

Five-D Property and for the opening of a new public road at the Tidball intersection are "precisely the type of petitioning activity" that *Noerr-Pennington* seeks to protect. (ECF No. 39 at 20.) Plaintiffs allege that Dunn's petitions to the Township were premised on falsity and outright lies, and therefore cannot possibly be considered "valid petitioning activity" within the meaning of *Noerr-Pennington*. (ECF No. 63 at 16.)

The *Noerr-Pennington* doctrine was first recognized in the context of antitrust litigation when the Supreme Court held in *Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965), that an individual cannot be found liable for exercising their First Amendment right to petition the government. Since its inception, the doctrine's scope has been expanded beyond antitrust to encompass additional areas of the law. *See, e.g.*, *Campbell v. Pa. Sch. Bds. Ass'n*, 972 F.3d 213, 220 (3d Cir. 2020) ("For instance, [the doctrine] shields constitutionally protected protesters from civil suits. It has also been applied…to bar § 1983 claims by state actors based upon constitutionally protected conduct."); *Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 159-61 (3d Cir. 2001) (summarizing the doctrine's applicability to various areas of law throughout the Circuits); *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.3d 155 (3d Cir. 1988) (affording *Noerr-Pennington* immunity to defendants in civil conspiracy action).

Today, *Noerr-Pennington* immunizes against any potential liability to ensure that an individual may "petition the government for official action favorable to their interests without fear of suit, even if the result of the petition, if granted, might harm the interests of others." *Zemenco, Inc. v. Developers Diversified Realty Corp.*, 2005 U.S. Dist. LEXIS 23011, at *28 (W.D. Pa. Oct.

7, 2005) (quoting *Tarpley v. Keistler*, 188 F.3d 788, 794 (7th Cir. 1999)). A petitioner's motivation for seeking redress is largely irrelevant, as "the right of individuals to petition the government 'cannot properly be made to depend on their intent in doing so.'" *Barnes*, 242 F.3d at 159 (quoting *Noerr*, 365 U.S. at 139).

There is no immunity under *Noerr-Pennington*, however, where the petitioning is merely a "sham" designed solely as a form of harassment. *See City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365 (1991) ("A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay."). A showing of ill intent or malice towards the party impacted by the petitioning activity alone is insufficient. *Campbell*, 972 F.3d at 219. Instead, the pursuit of claims must be "so baseless that no reasonable litigant could realistically expect to secure favorable relief." *Prof'l Real Estate Invs., Inc. v. Columbia Pictures Indus.* (*PREI*), 508 U.S. 49, 62 (1993). Accordingly, a showing that there was probable cause to institute the legal proceedings precludes a finding of baselessness. *Id.* at 62-63 ("[T]he existence of probable cause is an absolute defense.").

The Supreme Court established a two-part test to determine whether the sham exception bars immunity under *Noerr-Pennington*:

> First, the Court determines whether the petition is "objectively baseless;" if not, the petition is not a sham without regard to the subjective intent of the petitioner. Second, if the petition is objectively baseless (and only if it is objectively baseless), the Court is to look to the petitioner's "subjective motivation" and determine "whether the baseless petition conceals an attempt to interfere *directly* with the business relationships of a competitor through the use of governmental *process*–as opposed to the *outcome* of that process–as an anticompetition weapon."

19

*Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem'l Hosp.*, 185 F.3d 154, 158 n.2 (3d Cir.

1999) (quoting *PREI*, 508 U.S. at 60-61).  However, "whether a petition is a sham is generally a

question of fact for the jury[,]" and courts should "only rule on the objective baselessness prong

as a matter of law where there is no dispute over the predicate facts of the underlying petitions."

*In re Flonase Antitrust Litig.*, 795 F. Supp. 2d 300, 310 (E.D. Pa. 2011) (quoting *PREI*, 508 U.S.

at 60-61).

      Although the Third Circuit has declined to carve out a separate "fraudulent

misrepresentation" exception to the *Noerr-Pennington* doctrine, it has recognized that a party's

knowing fraud or intentional misrepresentation may be sufficient to trigger the sham exception.

In *Cheminor Drugs, Ltd. v. Ethyl Corp.*, the Court explained:

> If the alleged misrepresented facts do not infect the core of [the defendant's]
> claim and the government's resulting actions, then the petition had an
> objective basis and will receive *Noerr-Pennington* immunity under the first
> step of [the two-part test]. While we do not condone misrepresentations in
> a judicial setting, neither will we deprive litigants of immunity derived from
> the First Amendment's right to petition the government if the alleged
> misrepresentations do not affect the core of the litigant's [] case.
>
> . . . .
>
> If the government's action was not dependent upon the misrepresented
> information, the misrepresented information was not material and did not
> go to the core of [the defendant's] petition. In sum, a *material*
> misrepresentation that affects the very core of a litigant's [] case will
> preclude *Noerr-Pennington* immunity, but not every misrepresentation is
> material to the question of whether a petition such as [the defendant's] had
> an objective basis.

168 F.3d 119, 123-24 (3d Cir. 1999).

Turning to the present case, Dunn suggests that essentially all of his actions relative to the Five-D Property were valid petitioning activity within the meaning of *Noerr-Pennington*. In his briefing, Dunn specifically mentions: (1) petitioning the Township and PennDOT for direct signalized access to Route 60; (2) petitioning the Township and PennDOT to open a new public road; and (3) petitioning the Township to exercise its statutory authority for eminent domain against the Plaintiffs' property. (ECF No. 39 at 20.)

The record contains conflicting material evidence regarding the motive and truth behind some of the representations that form the basis of Dunn's petitions, however. On at least four separate occasions, PennDOT told Dunn that he would need to reach some type of agreement with Esposito that included compensation for Dunn's use of the E&R Property. (*See* ECF Nos. 65-9; 65-10; 65-11; 65-14.) Yet, Dunn never offered to compensate Plaintiffs in any way. PennDOT also said on at least two occasions that the E&R Property's HOP allowing for direct entry to Route 60 was valid and told Dunn that he would need "to develop a mutually agreeable solution" that would be acceptable to all parties before PennDOT would get involved. (ECF No. 65-9.)

The record also reflects that it was Dunn's engineer who first suggested eminent domain. (*See* ECF No. 63-64.) It appears that Dunn himself then branded his engineer's suggestion as the quickest and best option before he passed it along to Township officials. (*Id.*) As reflected in the Commonwealth Court opinion of which the Court takes judicial notice, several Township officials, including at least two of the Commissioners responsible for passing the condemnation resolution, were led to believe that the suggestion came directly from PennDOT. *See In re Robinson*, 2023 WL 3047814, at *12. As the Commonwealth Court concluded, however, "the record is devoid of

21

evidence to support the idea that PennDOT recommended condemnation of E&R Property for safety or any other purpose." *Id.* A reasonable jury could therefore conclude that Dunn intentionally misrepresented PennDOT's position in order to advance his own objective of developing the Five-D Property.

These misrepresentations go to the heart of Dunn's petitions as they directly relate to the relief Dunn was seeking from the Township, i.e., access from the Five-D Property directly onto Route 60 via a traffic signal. Further, when the record is viewed in the light most favorable to Plaintiffs, a reasonable jury could conclude that at least some of the Township's actions towards Plaintiffs were directly induced by Dunn's misrepresentations, and therefore, could also conclude that his actions were not valid petitioning activity.

Because there are genuine issues of material fact regarding whether Dunn's petitions included material misrepresentations sufficient to trigger the sham exception to the *Noerr-Pennington* doctrine, Dunn is not entitled to immunity. As this is Dunn's only argument with respect to Plaintiffs' Fifth Amendment § 1983 claim against him, Dunn's motion for summary judgment will be denied as to Count IV.

        2.   <u>The "sole purpose" of the alleged conspiracy was not to injure Plaintiffs.</u>

Next, Dunn argues that he is entitled to judgment in his favor with respect to Plaintiffs' civil conspiracy claim because he was not acting with the "sole purpose" of injuring Plaintiffs. Dunn asserts that his actions were in furtherance of his legitimate business interest in developing the Five-D Property, thus negating a perquisite to Plaintiffs' conspiracy claim. Plaintiffs contend

that summary judgment is inappropriate because genuine issues of fact exist regarding whether

Dunn acted with malice or for professional reasons.

> To prove a claim of civil conspiracy under Pennsylvania law, the plaintiff must show:

> (1) a combination of two or more persons acting with a common purpose to
>     do an unlawful act or to do a lawful act by unlawful means or for an
>     unlawful purpose;

> (2) an overt act done in pursuance of the common purpose; and

> (3) actual legal damage.

*Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003) (quoting

*Strickland v. Univ. of Scranton*, 700 A.2d 979, 987-88 (Pa. Super. Ct. 1997)).  Additionally, the

plaintiff must show "that the alleged conspiracy acted with the intent to injure the plaintiff – in

other words, malice." *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 419 (E.D. Pa. 2009).

> Malice requires that the sole purpose of the conspiracy was to injure the
> plaintiff and that this intent was without justification. Because malice can
> only be found when the sole purpose of the conspiracy is to injure the
> plaintiff, a showing that a person acted for professional reasons, and not
> solely to injure the plaintiff, negates a finding of malice.

*Buxton v. Rivers Casino*, 2020 U.S. Dist. LEXIS 7389, at *21 (W.D. Pa. Jan. 15, 2020) (citing

*Bro-Tech*, 651 F. Supp. 2d at 419).

> In both the Complaint and its briefing, Plaintiffs repeatedly allege that Dunn and the other

named defendants "engaged in a concerted and unlawful scheme to interfere with Plaintiffs' rights

**in furtherance of their common goal of advancing the development of the Five D Property** at

Plaintiffs' expense."  (ECF No. 1-3 ¶ 111.) (emphasis added).  Plaintiffs claim that in furtherance

of developing the Five-D Property, Dunn and the others orchestrated the initiation of criminal

proceedings against Esposito; tortiously interfered with the contractual relationship of E&R Partners and its tenant; and deprived Plaintiffs of their property rights by unconstitutionally condemning the E&R Property.  (*Id.* at ¶ 118.)

Based on Plaintiffs' own admissions, however, their civil conspiracy claim is fatally flawed, as it does not allege that the "sole purpose" of the alleged conspiracy was to injure Plaintiffs.  *See, e.g.*, *Three Rivers Hydroponics, LLC v. Florists' Mut. Ins. Co.*, 2018 U.S. Dist. LEXIS 20699, at *18-19 (W.D. Pa. Feb. 8, 2018) ("[I]njury that is incidental to another purpose, even if it appears 'selfish or unreasonable,' is not malicious"); *Barker v. Hostetter*, 2014 U.S. Dist. LEXIS 51688, at *98 ("The fact that it may have been necessary to deceive Plaintiffs, or to otherwise willfully and maliciously commit various torts against them…does not equate to an allegation that the conspiracy was formed with the sole intent to injure Plaintiffs.") (E.D. Pa. Apr. 15, 2014).  By pleading their civil conspiracy claim in this manner, Plaintiffs negated an essential element required under Pennsylvania law:

> Plaintiffs' case is built on the theory that Defendants acted for their business advantage and benefit. Plaintiffs have adduced significant evidence to show as much, and many claims based on this theory survive for trial. One consequence of this approach is that a civil conspiracy claim is not now tenable because Plaintiffs' evidence belies the notion that Defendants acted without a business motive, but purely out of malice. As Defendants have demonstrated that there is no genuine issue of material fact to this point, [the civil conspiracy claim] will be dismissed in its entirety.

*Bro-Tech*, 651 F. Supp. 2d at 419.

Accordingly, summary judgment will be granted in favor of Dunn with respect to the civil conspiracy claim in Count III.[16]

**B.   The Township and Urbano's Motion for Partial Summary Judgment**

The Township and Urbano (collectively "the Township Defendants") seek dismissal only of the Fifth Amendment unlawful taking claim in Count IV brought by Capital Builders and E&R Partners.[17]

1.   A reasonable jury could conclude that Urbano was personally involved in the unlawful taking of Plaintiffs' property.

In Count IV, Plaintiffs allege that the Township Defendants violated their Fifth Amendment civil rights.  The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. Amend. V.

The Township Defendants argue in their joint motion that Urbano cannot be found liable for violating Plaintiffs' Fifth Amendment rights because he was not personally involved in the alleged taking.  (ECF No. 48 at 6.)  They contend that Urbano is entitled to summary judgment as to Count IV because the record lacks evidence that Urbano "had any role in the preparation of filing the Declaration of Taking or the subsequent litigation[.]"  (*Id.*)  The Court rejects this argument.

Plaintiffs bring this claim under § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."

---

[16]  For the same reasons, Schonbeck's motion for summary judgment will also be granted as to Count III.
[17]  For the reasons previously discussed with respect to the civil conspiracy claim in Count III, Urbano is also entitled to judgment in his favor as a matter of law as to Count III.

*West v. Atkins*, 487 U.S. 42, 48 (1988).  Section 1983 does not itself create any substantive rights; it simply provides a cause of action that allows the plaintiff to vindicate rights that have already been secured.  *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("§ 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere").

The plaintiff in a § 1983 action must also show "personal involvement" by alleging how each named defendant was involved in the events or occurrences giving rise to the claims.  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998).  "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity."  *Id.*

In the Complaint, Plaintiffs allege that Urbano was involved in a myriad of unconstitutional acts directed towards Plaintiffs that ultimately resulted in the condemnation of the E&R Property. As evidence of Urbano's personal involvement, Plaintiffs argue that some of the Township Commissioners responsible for passing the condemnation resolution relied on Urbano's professional opinion as the Director of the Planning Department when casting their vote.  (ECF No. 57 at 22.)  The record supports Plaintiffs' allegation.

As discussed, in making its decision on the legality of the Township's eminent domain action, the Commonwealth Court conducted a thorough review of the record, which included testimony from Urbano.  *See In re Robinson*, 2023 WL 3047814, at *7-11.  Two out of the five voting Commissioners specifically mentioned relying on the advice of the Planning Commission when voting to condemn.  The Commonwealth Court noted that Urbano testified that the Tidball

26

intersection was unsafe but was "unable to articulate any further basis for his contention," and "didn't seek any police reports, could not verify a number of accidents at that intersection, and he had not heard of anyone from the public who has a concern about the safety of that intersection." *Id.* at *10. Urbano also "testified several times that it was PennDOT that first brought up the idea of condemning E&R Property." *Id.* However, additional record evidence suggests that Urbano had reason to know that the advancement of condemnation as the "best option" actually came from Dunn and his engineer, not PennDOT. (*See* 4/19/2018 J. Crosby email to M. Dunn, ECF No. 41-1 at 63-64.) Thus, a reasonable jury could conclude that Urbano intentionally provided false information to the Commissioners in order to secure the passage of the condemnation resolution in violation of Plaintiffs' Fifth Amendment rights.

That being said, the Court acknowledges that the record in this case is extensive and contains many competing accounts of the events leading up to the present. But determining the credibility of testimony and assigning weight to evidence is a function reserved for the jury, far beyond the scope of summary judgment review. *Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). Plaintiffs have alleged facts sufficient to plausibly show Urbano's personal involvement in the alleged constitutional misconduct underlying Count IV to defeat summary judgment.

### 2. Urbano is not entitled to qualified immunity.

Next, the Township Defendants argue that Urbano is entitled to qualified immunity because "there are no cases on-point that would have sufficiently placed him on notice that the conduct

complained of in Plaintiffs' Complaint specific to Count IV could be considered unconstitutional." (ECF No. 48 at 7.)

Qualified immunity shields government officials from civil liability stemming for conduct occurring during the performance of discretionary duties. "The primary purpose of affording public officials the privilege of qualified immunity, thus insulating them from suit, is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" *Andrews v. Bureau of Codes Admin. Office*, No. 1:08-CV-1669, 2012 U.S. Dist. LEXIS 23835, at *40 (M.D. Pa. Feb. 24, 2012) (quoting *Elder v. Holloway*, 510 U.S. 510, 514 (1994)). Qualified immunity is not available, however, when state officials violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

As the Township Defendants concede in their brief, the Commonwealth Court already determined that the Township's conduct in attempting to condemn Plaintiffs' property was unconstitutional. *See In re Robinson*, 2023 WL 3047814, at *12-13. Plaintiffs allege that Urbano participated in the violation by acting in concert with Dunn and the Township to take the E&R Property without just compensation in violation of the Fifth Amendment Takings Clause in order to benefit a private landowner. (ECF No. 1-3 ¶¶ 128-29.) Thus, the remaining question as to Urbano is "whether the rights asserted by Plaintiff[s] were well-established such that a reasonable officer of the [Township] would have known they were violating Plaintiff[s'] rights." *Andrews*, 2012 U.S. Dist. LEXIS 23835, at *43. While there is still some uncertainty regarding facts that may establish Urbano's motive and level of involvement in the condemnation proceedings, it is

28

clear that a reasonable official would have known that the conduct alleged would violate Plaintiffs'

rights.  Accordingly, Urbano is not entitled to qualified immunity as to Count IV.

3.  <u>*Res judicata* does not bar Plaintiffs' Fifth Amendment § 1983 claim.</u>

The Township Defendants also argue that the doctrine of *res judicata* requires dismissal of

Plaintiffs' Fifth Amendment unlawful taking claim.  (ECF No. 48 at 3-5.) Their reliance on *res*

*judicata* in this context, however, is misplaced.

Plaintiffs' ability to bring their Fifth Amendment § 1983 claim against the Township

Defendants arose independently from the state court proceedings to determine the legality of the

Township's condemnation action.  In *Knick v. Township of Scott*, the Supreme Court explained

that "the settled rule is that 'exhaustion of state remedies is not a prerequisite to an action under

42 U.S.C. § 1983.'" 139 S. Ct. 2162, 2167 (quoting *Heck v. Humphrey*, 512 U.S. 477, 480 (1994)).

Specifically, the Court held that a government "violates the Takings Clause when it takes property

without compensation, and the property owner may bring a Fifth Amendment claim under § 1983

at that time." *Id.* at 2165.  The Court explained:

> A property owner has an actionable Fifth Amendment takings claim when
> the government takes his property without paying for it. That does not mean
> that the government must provide compensation in advance of a taking or
> risk having its action invalidated: So long as the property owner has some
> way to obtain compensation after the fact, governments need not fear that
> courts will enjoin their activities. But it does mean that the property owner
> has suffered a violation of his Fifth Amendment rights when the
> government takes his property without just compensation, and therefore
> may bring his claim in federal court under § 1983 at that time.

*Id.* at 2167-68.  Thus, Plaintiffs' rights were violated, and their cause of action under § 1983

accrued, the moment the Township filed the Declaration of Taking on May 11, 2018.  Although

the Township was not required to compensate Plaintiffs prior to the taking, "the act of the taking is the event that gives rise to the claim for compensation[,]" and the "right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner." *Id.* at 2170.

Further, the Commonwealth Court's opinion does not address potential damages owed to Plaintiffs or otherwise seek to remedy the violation of Plaintiffs' civil rights under § 1983. *See id.* at 2172 ("A later payment of compensation may remedy the constitutional violation that occurred at the time of the taking, but that does not mean the violation never took place.").  Therefore, Plaintiffs were well within their rights to seek redress for the alleged on-going violation of their Fifth Amendment rights regardless of any subsequent state court proceedings that may have occurred.

Accordingly, for the reasons set forth above, the Township and Urbano's partial motion for summary judgment as to Count IV will be denied.

### C.  <u>Schonbeck's Motion for Summary Judgment</u>

Schonbeck seeks dismissal of all claims against him, which are malicious prosecution in Count I; tortious interference in Count II; civil conspiracy in Count III; and the Fifth and Fourteenth Amendment claims in Count V.  As the Court has already determined that Count III will be dismissed in its entirety, this claim will be excluded from the Court's analysis of his motion.

####    1.  <u>Schonbeck is not entitled to immunity under the Political Subdivision Tort Claims Act.</u>

Schonbeck argues that Plaintiffs' state law claims of malicious prosecution and tortious interference with contractual relations are barred because, as the Township's Code Enforcement

30

Officer, he is entitled to immunity under the Political Subdivision Tort Claims Act ("PSTCA").

(ECF No. 62 at 7-10.)  The PSTCA reads, in relevant part:

> In any action brought against an employee of a local agency for damages on account of an injury to a person or property based upon claims arising from, or reasonably related to, the office or the performance of the duties of the employee, the employee may assert on his own behalf, or the local agency may assert on his behalf:
>
> ….
>
> (2)  The defense that the conduct of the employee which gave rise to the claim was authorized or required by law, or that he in good faith reasonably believed the conduct was authorized or required by law.

42 Pa. Cons. Stat. § 8546(2).

PSTCA immunity is not available, however, in an action against a government employee "for damages on account of injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct."  42 Pa. Cons. Stat. § 8550.  In this context, the term "willful misconduct" has the same meaning as the term "intentional tort."  *See Pellegrino Food Prods. Co. v. City of Warren*, 136 F. Supp. 2d 391, 403 (W.D. Pa. 2000) (citing *Delate v. Kolle*, 667 A.2d 1218, 1221 (Pa. Cmmw. Ct. 1995), *app. denied*, 678 A.2d 367 (Pa. 1996).  The actor must have "desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied."  *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) (citing *Evans v. Philadelphia Trans. Co.*, 212 A.2d 440 (Pa. 1965)).

31

In the present case, Plaintiffs set forth state law claims for malicious prosecution (Count I) and tortious interference with contractual relations (Count II).   A malicious prosecution claim under Pennsylvania law requires the plaintiff show that the defendant:

(1) instituted legal proceedings against the plaintiff;

(2) without probable cause;

(3) **with malice**; and

(4) the proceedings were ultimately terminated in plaintiff's favor.

*Vinosky v. Consiglio*, 2021 U.S. Dist. LEXIS 187184, at *26 (W.D. Pa. Sept. 29, 2021) (quoting *Corrigan v. Cent. Tax Bureau of Pa., Inc.*, 828 A.2d 502, 505 (Pa. Commw. Ct. 2003)) (emphasis added).

The elements of tortious interference under Pennsylvania law consist of:

(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;

(2) **purposeful action on the part of the defendant**, **specifically intended to harm the existing relation**, or to prevent a prospective relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Pellegrino*, 136 F. Supp 2d at 408 (quoting *Pelagatti v. Cohen*, 536 A.2d 1337, 1343 (Pa. Super. Ct. 1988), *app. denied*, 548 A.2d 256 (Pa. 1988)) (emphasis added).

Plaintiffs allege that Schonbeck deliberately and improperly filed criminal charges against Esposito for alleged zoning violations at the E&R Property "with the intent of shutting down the business operations of TCI and Capital Realty – and to interfere with E&R Partners' contractual

relationship with [TCI]."   (ECF No. 1-3 ¶¶ 105.)   Plaintiffs contend that Schonbeck, the Township's only Code Enforcement Officer, knew or should have known that neither the Township's own Zoning Ordinances nor the Municipalities Planning Code ("MPC") authorized criminal prosecution of a non-record owner for zoning violations.  (*Id.* at 18-19.)  Although the criminal proceedings were ultimately resolved in Esposito's favor, Schonbeck's allegedly "relentless pursuit of unsubstantiated and improper enforcement proceedings aimed at TCI's business operations" culminated in TCI terminating its lease with E&R Partners and vacating the premises.  (ECF No. 77 at 19.)   Additionally, Plaintiffs allege, and the record supports, that Schonbeck failed to conduct any meaningful investigation before issuing the criminal citations, further bolstering Plaintiffs' claim that the criminal citations lacked probable cause.  (12/27/2021 J. Schonbeck Dep. 46, 76, ECF No. 79-3.)

Thus, Plaintiffs' remaining state law claims against Schonbeck for malicious prosecution and tortious interference allege willful conduct.  *See, e.g.*, *Pellegrino*, 136 F. Supp. 2d at 403 (denying PSTCA immunity to defendant city officials for intentional torts pursuant to § 8550). Because immunity is an affirmative defense, Schonbeck bears the burden of proof on this issue. *See Reed v. Target Corp.*, Civ. Action No. 23-896, 2023 U.S. Dist. LEXIS 228433, at *11 (W.D. Pa. Dec. 21, 2023); *see also Justice v. Lombardo*, 208 A.3d 1057, 1068 (Pa. 2019).  Where the facts and inferences to be drawn from those facts are undisputed, the court may determine the scope as a matter of law. *Justice*, 208 A.3d at 1068.  On the other hand, when more than one inference can be drawn, this issue must be resolved by the factfinder.  *Id.*  Because the facts and

inferences relating to Schonbeck's treatment of Plaintiffs are materially disputed, he has failed to carry his burden of showing that he is entitled to PSTCA immunity.

As this is Schonbeck's only argument with respect to Plaintiffs' tortious interference with contractual relations claim against him in Count II, his motion for summary judgment will be denied as to Count II.

> 2. Whether Schobeck's actions were supported by probable cause is a disputed material issue of fact.

Plaintiffs have asserted claims against Schonbeck for malicious prosecution and violation of Esposito's substantive due process rights, arguing that Schonbeck's initiation of criminal proceedings for the alleged zoning violations was unlawful and egregious.[18]  (ECF No. 1-3 ¶¶ 90-101, 132-146.)  Schonbeck argues that there was probable cause to support his actions and, because the existence of probable cause in this context is an absolute defense, he is therefore entitled to summary judgment.  (ECF No. 62 at 11-14, 19-21.)

Plaintiffs contend that Schonbeck's criminal actions against Esposito were initiated without probable cause and with malice.  (ECF No. 77 at 20.)  Schonbeck criminally charged Esposito for the alleged zoning infractions "despite the fact that the applicable provisions of the MPC, as well as the Township's own Zoning Code[,] both call for enforcement remedies solely through civil actions."  (*Id.* at 21.)  Plaintiffs argue that Schonbeck improperly brought criminal charges against Esposito individually, rather than E&R Partners as the record owner, without undertaking any type of investigation.  (*Id.* at 21-22.)  Plaintiffs allege that "as a direct result of

---

[18]  As the Court interprets it, the tortious interference alleged by Plaintiffs is necessarily the byproduct of Schonbeck's alleged malicious prosecution of Esposito. Because these two claims are entwined to some extent, this analysis has some relevance to the tortious interference claim as well.

Schonbeck's actions, Esposito has been forced to expend tens of thousands of dollars to defend against unfounded criminal charges, and TCI vacated the E&R Property." (*Id.* at 22.)

Schonbeck argues that Plaintiffs' malicious prosecution claim is barred because his actions "were based upon probable cause and were not made with malice." (ECF No. 62 at 11.) He asserts that "it is undisputed" that he "was acting within the scope of the performance of his employment duties as Code Enforcement Office[r] in all interactions with the Plaintiffs and Plaintiffs have presented no testimony supporting any conclusion to the contrary." (*Id.* at 7.) Schonbeck further claims that because all of his actions with respect to Esposito were allegedly taken at the direction of Urbano and Solicitor Cambest, "Plaintiffs have failed to allege or otherwise proffer any evidence that [he] acted without probable cause in investigating the Robinson Township Code violations at the E&R Property." (*Id.* at 12.)

Schonbeck repeatedly claims to have instituted the criminal proceedings against Esposito "at the direction of Mr. Urbano" and that he "was following the directives of Mr. Urbano," at all times. (*Id.* at 9.) This is disputed, however. As he testified at his deposition, Urbano specifically denies being Schonbeck's boss or having anything to do with the criminal citations, stating:

Q.    You told Mr. Schonbeck to go down and do an inspection?

A.    Yes.

Q.    Why would Mr - earlier I believe you indicated that you don't have authority over the code enforcement officer –

A.    I don't have authority over him, we work in conjunction.

Q.    Well, let me just finish the question. So working in conjunction with, Mr. Schonbeck in his deposition yesterday said that he reports to

you, not that he works in conjunction with you. Can you explain the difference?

A.    Well, depends what he mean by reports.

Q.    You're his boss?

A.    No, I'm not his boss. I am nobody's boss.

Q.    Did you and Mr. Dunn have any follow-up conversations about possible occupancy permitting issues at the 5852 Steubenville Pike property?

A.    No.

Q.    Never had any conversation with Mr. Dunn about the citation ultimately filed against Mr. Esposito personally?

A.    No, I don't file citations, that's up to Mr. Schonbeck. He may have told me about them but I didn't have anything to do with them. I don't have the right to write citations to anybody.

Q.    Mr. Urbano, did you ever instruct, in conjunction or just as a directive, Mr. Schonbeck to file the citations against Mr. Esposito?

A.    No. Not my position to do that.

Q.    Regardless of what your position is, and I understand all that -

A.    Yeah. No.

(12/28/2021 R. Urbano Dep. 115-16, ECF No. 79-6.)  Thus, there is a genuine issue of material

fact regarding whether Schonbeck acted on his own or whether he took certain actions at the

direction of Urbano.

Somewhat incredibly for a person in his position, Schonbeck claims to have been unaware

of any mandatory procedures for issuing code violation citations; rather, he testified that he "kind

of invented [his] own."  (12/27/2021 J. Schonbeck Dep. 33, ECF No. 79-3.)  His general practice

was that upon becoming aware of a code violation, he would first send written notice giving the property owner five days to remedy the alleged violation.  (*Id.* at 32.)  Schonbeck described this five-day notice as a "courtesy kind of warning just to communicate, hey, here's the problem, can you fix this or will you fix this."  (*Id.*)  The bottom of the notice would indicate that it was issued by the Code Enforcement Officer and Schonbeck would initial the document.  (*Id.*)  Schonbeck would ascertain the owner's identity by searching the property on the county's tax assessment website.  (*Id.* at 45.)  If the property owner failed to fix the violation within the five-day window, Schonbeck would issue another written notice giving the owner an additional ten days to respond.  (*Id.* at 33.)  If there was still no corrective action or communication from the property owner, "then, only then, after that" would Schonbeck file a citation with the local magistrate.  (*Id.* at 31.)  Despite Schonbeck's acknowledged practices, however, Esposito never received any notices from Schonbeck directly regarding the E&R Property.

As previously recounted, Schonbeck issued not one, but two criminal citations to Esposito for alleged code violations at the E&R Property.  (*Id.* at 40-41.)  The citations were issued to Esposito personally despite Esposito never holding title to the E&R Property.  (*Id.* at 144-45.)  In fact, Schonbeck testified at his deposition on December 27, 2021:

> Q.  You know as we sit here today that Mr. Esposito has never personally owned [the E&R Property]?
>
> A.  No, I don't know that.
>
> Q.  You don't know that?
>
> A.  No.

37

(*Id.* at 46.)  Thus, Schonbeck failed to confirm the identity of the E&R Property's record owner prior to instituting criminal proceedings.  He also admitted that he issued the criminal citation based solely on the word of Urbano without so much as checking whether the E&R Property had an occupancy permit on file with the Township.  (*Id.* at 76.)

Unsurprisingly, the Pennsylvania Commonwealth Court later deemed Schonbeck's initial criminal citation deficient as he "did not comply with the mandatory enforcement notification requirements of the MPC Section 616.1 before issuing the Citation based on the Zoning Ordinance and seeking penalties under Section 617.2 of the MPC[.]"[19]  *Twp. of Robinson v. Esposito*, 210 A.3d 1146, 1151 (Pa. Commw. Ct. 2019).

It is unclear why Schonbeck would deviate so significantly from his normal protocol for issuing code violation citations.  But determining whether Schonbeck's conduct was the result of following orders, malice, negligence, or just plain ignorance of the Township's own procedures is a question better reserved for the jury.  *See Anderson*, 477 U.S. at 249.  Therefore, Schonbeck's motion will be denied as to the malicious prosecution claim (Count I), tortious interference with contractual relations claim (Count II), and substantive due process claim (Count V) so that the jury may decide whether his actions towards Plaintiffs were proper.

---

[19]   The MPC describes available enforcement remedies, stating in relevant part: "Any person, partnership or corporation who or which has violated or permitted the violation of the provisions of any zoning ordinance enacted under this act or prior enabling laws shall, upon being found liable therefor in a **civil enforcement proceeding** commenced by a municipality, pay a judgment of not more than $500 plus all court costs, including reasonable attorney fees incurred by a municipality as a result thereof." 53 Pa. Stat. Ann. § 10617.2 (West) (emphasis added).

**V.       Conclusion**

For these reasons, summary judgment will be granted in favor of Defendants Urbano,

Schonbeck, and Dunn as to the civil conspiracy claim in Count III.  The motions for summary

judgment of Dunn (ECF No. 38), the Township and Urbano (ECF No. 47), and Schonbeck (ECF

No. 60) otherwise will be denied.

Appropriate orders to follow.


Dated: March 26, 2024                              BY THE COURT:


                                                   /s/ Patricia L. Dodge
                                                   PATRICIA L. DODGE
                                                   UNITED STATES MAGISTRATE JUDGE